LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE
SUITE 1600
PHOENIX, ARIZONA 85004
TELEPHONE: (602) 271-7700
FACSIMILE: (602) 258-7785
Sarah L. Barnes /Bar No. 020362
Jeremiah M. Sullivan /Bar No. 038569
E-mail: slb@bowwlaw.com
jms@bowwlaw.com
kel@bowwlaw.com
Attorneys for Defendant Advanced Correctional Healthcare, Inc.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Amanda Gardner,<br><br>Plaintiff,<br><br>v.<br><br>Navajo County, *et al.*,<br><br>Defendants. | **No. 3:23-cv-08594-DWL-ASB**<br><br>**REPLY IN SUPPORT OF DEFENDANT ADVANCED CORRECTIONAL HEALTHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Advanced Correctional Healthcare, Inc. ("ACH"), by and through undersigned counsel, hereby files this Reply in support of its Motion for Summary Judgment. (Doc. 197) on Plaintiff's *Monell* and state law medical malpractice and negligence/gross negligence claims. Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 212), Omnibus Additional Statement of Facts ("PASOF") (Doc. 204), and Response to ACH's Statement of Facts ("PRSOF") (Doc. 213) fail to set forth any evidence to support her claims for deliberate indifference, medical malpractice, and negligence/gross negligence. Plaintiff's assertions, even if accepted as true, are insufficient to support her claims as a matter of law.

## I. OBJECTIONS TO PLAINTIFF'S STATEMENT OF FACTS

Plaintiff's Response cites 13 paragraphs from the PASOF. (PASOF ¶¶ 4, 7-14, 17, 19, 29, 56.) "Conclusory allegations, unsupported by factual material, are insufficient to defeat summary judgment." *Gillard v. Good Earth Power AZ LLC*, CV-17-01368-PHX-DLR, 2019 WL 1280946, at *2 (D. Ariz. Mar. 19, 2019). Moreover, "[i]f the non-movant's opposition fails to cite specifically to evidentiary materials, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials." *Id.*

Plaintiff's PASOF is objectionable for at least three (3) reasons. First, most of the paragraphs cited by Plaintiff contain speculative and conclusory arguments masquerading as factual assertions. (*See*, *e.g.*, PASOF ¶¶ 7, 13, 19.)

Second, there are numerous factual assertions in the PASOF that reference ACH; however, they are not cited in Plaintiff's Response. Therefore, ACH is not required to address the factual assertions that are not specifically cited in Plaintiff's Response.

Third, and lastly, Plaintiff repeatedly uses the term "Defendants" without identifying which specific Defendant the factual assertion pertains to. (*See*, *e.g.*, PASOF ¶¶ 11-14, 17.) Plaintiff's PASOF is further objectionable because she seeks to hold ACH liable based on evidence that is not attributable to ACH. For example, Plaintiff repeatedly references the testimony of NP Morse and NP Osinloye to establish ACH's liability. (*See* PASOF ¶¶ 10-14, 29, 56.) Plaintiff should know that NP Morse and Osinloye are not ACH employees, and thus, they cannot provide competent or relevant testimony regarding the care provided by ACH. *See* Morse Depo 15:7-10, 26:8-17, *attached as* **Exhibit S**; Osinloye Depo 9:19-2, *attached as* **Exhibit T**. Likewise, Plaintiff relies on Defendant Wexford Corrective Action Plan, which was implemented after ACH was no longer at Navajo County Jail to support her claim against ACH. (PASOF ¶ 19.) As argued below, Plaintiff's reliance on Wexford's Corrective Action Plan is not competent evidence that supports her

claims against ACH.

At best, Plaintiff's attempt to support her factual assertions against ACH with the testimony of non-ACH employees and records that were produced after the ACH timeframe evidences an unintentional misrepresentation to the Court. At worst, Plaintiff seeks to intentionally deceive the Court to survive summary judgment. Either way, the testimony of NP Morse and NP Osinloye and Wexford's Corrective Action Plan are not relevant to Plaintiff's claims against ACH.

## II. PLAINTIFF'S *MONELL* AND STATE LAW CLAIMS FAIL DUE TO AN IRRECONCILABLE CAUSATION PROBLEM

ACH was the contractor at Navajo County Jail from October 6, 2021, to March 13, 2022. (SOF ¶ 2.) ACH and its staff were only involved Gardner's care from October 6, 2021, through March 13, 2022. Wexford and its staff were responsible for Gardner's care from March 14, 20022 through the November 8, 2022, incident that resulted in Plaintiff's alleged injuries. Plaintiff argues that under Arizona law, causation is satisfied pursuant to the substantial factor test, and under federal law, "causation must be a moving force behind the constitutional deprivation", and that her expert testimony satisfies both standards. (Doc. 212, at 11:12-13, 13:7-18.)

Plaintiff fails to cite any case law on the substantial factor test. Arizona courts have emphasized that "negligence is not actionable in the abstract." *Sabina v. Yavapai Cnty. Flood Control Dist.*, 993 P.2d 1130, 1135 (Ariz. Ct. App. 1999). A defendant's acts are the proximate cause of a plaintiff's injury only if they are a substantial factor in bringing about the harm. *Barrett v. Harris*, 86 P.3d 954, 961 (Ariz. Ct. App. 2004). "The mere possibility of causation is not enough." *Grafiti-Valenzuela v. City of Phoenix*, 167 P.3d 711, 717 (Ariz. Ct. App. 2007); *see also Badia v. City of Casa Grande*, 988 P.2d 134, 142 (Ariz. Ct. App. 1999) ("Sheer speculation is insufficient to establish the necessary element of proximate cause or to defeat summary judgment.") While causation generally is a fact question,

summary judgment is appropriate if no reasonable juror could conclude that the damages were proximately caused by a defendant's conduct. *Gipson v. Kasey*, 150 P.3d 228, 230 & n.1 (Ariz. 2007) (en banc).

ACH agrees that Plaintiff was a pretrial detainee, and thus, *Gordon v. County of Orange* delineates the legal standard to for her Fourteenth Amendment claim for deliberate indifference. Therefore, for Plaintiff's federal claim, *Gordon v. County of Orange* identifies two critical factors that Plaintiff fails to demonstrate:

> (ii) [the] conditions [of confinement] put the plaintiff at substantial risk of suffering serious harm;
>
> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).[1] For the second *Gordon* factor, Plaintiff fails to demonstrate how ACH providers put her at a serious risk suffering serious harm by continuing and increasing her amitriptyline prescription by allegedly failing to conduct further testing. Plaintiff's own admission and expert testimony establish that she exhibited no objective symptoms that necessitated further testing; and Plaintiff fails to explain how the only other purported shortcoming identified in Dr. McMunn's report, missing blood pressure medication for a brief period, put her at a substantial risk of suffering serious harm.

Likewise, Plaintiff fails to establish both the fourth *Gordon* factor and that ACH was a substantial factor in bringing about her injuries. A reasonable juror could not conclude that ACH's alleged improper conduct was the cause of Plaintiff's injuries. *See also* Section II.A-C, *infra*. Plaintiff's reliance on Dr. McMunn to establish causation is misplaced. His only opinions regarding ACH are standard of care opinions, not causation. Specifically, Plaintiff cites Dr. McMunn's report as support for the conclusion that "ACH's failure to take reasonable measures to abate the risk resulted in [Plaintiff's] injuries."

[1] The third critical *Gordon* factor is addressed in Section III, *infra*.

(PASOF ¶ 19.) Dr. McMunn is a standard of care, not a causation expert, and thus, any purported causation opinion rendered by him amounts to sheer speculation. Moreover, he is not qualified to render any opinion to establish the requisite causal link between ACH's alleged negligent conduct and Plaintiff's injuries. Consequently, he cannot correlate any alleged Plaintiff's alleged injuries to any purported breach of the standard of care. He is not a cardiologist or toxicologist; he cannot render a causation opinion.

### A. Dr. Brodsky's Causation Opinions Are the Death Knell to Plaintiff's Causation Theory for Three Reasons

First, Dr. Brodsky maintains that there are four signs of heart failure that may necessitate further evaluation: edema, dyspnea, weight gain, and high dose polypharmacy. (SOF ¶ 20.) Plaintiff concedes these signs of heart failure did not manifest during the ACH timeframe. (PRSOF ¶¶ 21 ("Undisputed that the physical symptoms of edema were first documented after ACH left the jail."); *id.* ¶ 22 ("Undisputed that the initial documentation of respiratory issues occurred after ACH left the jail."); *id.* ¶ 23 (undisputed that "Plaintiff gained weight under Wexford's care; she did not gain weight while under the care of ACH."; *id.* ¶ 25 (undisputed that ACH did not prescribe "gabapentin, quetiapine, and buspirone").)

Second, Dr. Brodsky identifies six "missed opportunities" where "Defendants"[2] could have prevented" Plaintiff's injuries: (1) "[s]tarting high dose psychotropic polypharmacy beginning in July 2021 without regard for cardiac safety"; (2) "[f]ailing to conduct even a simple ECG or echocardiogram"; (3) "[i]gnoring her progressive symptoms of heart failure (weight gain, edema, dyspnea)"; (4) "[f]ailng to perform basic medication review when symptoms developed"; (5) "[f]ailing to refer her to a cardiologist despite clear red flags"; and (6) "[p]rescribing additional medications (quetiapine and buspirone) that

[2] Dr. Brodsky's use of "Defendants" is insufficient to establish how ACH allegedly caused Plaintiff's injuries. *See generally Mora v. City of Chula Vista*, 20-CV779-GPC, 2021 WL 1165054, at *3 (S.D. Cal. Mar. 26, 2021) (recognizing merely "lumping multiple named defendant[s]" together violates Rule 8's notice requirement).

compounded the cardiac risks already posed by amitriptyline, mirtazapine, and Gabapentin." (Doc. 198, at 14-15, A Gardner 10634-35.) The first issue relates to starting Plaintiff on amitriptyline, which occurred before the ACH timeframe. For the second issue, not conducting an ECG or echocardiogram, Dr. Brodsky explains in another part of his report that no "standard evaluations," i.e., and ECG, echocardiogram, or further cardiac assessment, were performed despite "months of documented swelling, dyspnea, weight gain, and high-dosage polypharmacy." (*Id.* at 13, A Gardner 10633.) In other words, "standard evaluations" were allegedly necessary once Plaintiff exhibited objective signs of potential heart issues; however, Plaintiff concedes that she never exhibited these symptoms during the ACH timeframe. (PRSOF ¶¶ 21-23.) The third, fourth, and fifth issues relate to objective symptoms that Plaintiff developed, which according to Dr. Brodsky, necessitated further medical action. Because these issues did not manifest while ACH was the medical provider at Navajo County jail, these issues identified by Dr. Brodsky are not attributable to ACH. The sixth issue does not apply to ACH because ACH providers never prescribed Plaintiff quetiapine or buspirone. (SOF ¶ 26; PRSOF ¶ 26.)

Third, and most importantly, Dr. Brodsky opines that Plaintiff's injuries were caused by "medication-induced heart failure" and "polypharmacy-induced respiratory depression." (Doc. 198, at 14, A Gardner 10634.) He attributes these issues to the combination of amitriptyline, mirtazapine, gabapentin, quetiapine, and buspirone. (*Id.* at 15, A Gardner 10635.) Significantly, Plaintiff concedes that it is "[u]ndisputed that ACH did not include gabapentin, quetiapine, and buspirone" in her treatment regimen. (PRSOF ¶ 26.) Dr. Brodsky's rebuttal report doubles down on causation being linked to the combination of the above medication: "She suffered progressive cardiopulmonary decline failure ***due to the cumulative effects*** of multiple high dose CNS and cardiac depressants—amitriptyline, mirtazapine, gabapentin, quetiapine, and buspirone. (Doc. 204-1, at 101-02, A Gardner 10712-13 (emphasis added).)

Ignoring the above issues, Plaintiff clings to Dr. Brodsky's opinion that an "EKG would probably have shown abnormalities and resulted in cardiac workup." (Doc. 212, at 10:19-20.) Plaintiff's attempt to pluck one (1) line out of Dr. Brodsky's report to manufacture a fact question is improper; context matters. *See* Fed.R.Evid. 702 (requiring an expert's opinion to find support in "sufficient facts or data"); *see also Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 837, 847 (S.D. W. Va. 2018) ("A single expert's opinion cannot be analyzed in a vacuum, devoid of the meaningful context of issues presented and a party's other evidence and experts."). Dr. Brodsky's opinion regarding the need for further evaluations is directly linked to Plaintiff allegedly exhibiting objective signs of heart failure. Because these objective symptoms never manifested during the ACH timeframe, Dr. Brodsky's opinion is insufficient to correlate causation to any of Dr. McMunn's supposed breaches of the standard of care. Moreover, merely stating that an EKG would probably have detected a heart issue too conclusory and speculative to establish a triable issue of fact on causation.

**B. <u>Dr. Pike's Opinions Also Do Not Establish Causation</u>**

Next, Plaintiff argues that Dr. Pike, a toxicologist, opines that "dangerous drug interactions involving CYP2D6 metabolic inhibition include the metoprolol combined with amitriptyline, mirtazapine, and clonazepam, and metoprolol is already in place by ACH." (Doc. 212, at 10:22-26.) Yet again, Plaintiff misrepresents the content of her experts' reports and ignores portions of Dr. Pike's report that are fatal to her theory of causation. Dr. Pike opines "[g]iven that, A 'heart problem' was recorded in a July 15, 2022, and October 21, 2022 . . . a 12-lead EKG should have been performed" and "[w]hen Navajo County Jail medical staff became aware of [Plaintiff's] heart failure, ankle edema, and staff expressed concerns 'about Elavil causing problem. Hx meth use,' they should have referred her to a hospital for a complete cardiac evaluation and cardiology consultation." (Doc. 204-1, at 118-19, A Gardner 10583-84.) Just like Dr. Brodsky, Dr. Pike recognizes that further

monitoring and evaluation became necessary once Plaintiff began to exhibit objective symptoms that could be associated with heart failure. But Plaintiff did not present with such symptoms while under ACH's care. Accepting Dr. Brodsky and Dr. Pike's opinions as true, Plaintiff cannot establish causation.

### C. <u>Plaintiff's Additional Factual Assertions Fail to Establish that ACH Caused Her Injuries</u>

Plaintiff, seemingly aware of the issues with her expert reports, and in a last-ditch effort to establish a fact question on causation, argues that "ACH cannot use its own failure to test as a causation shield." (Doc. 212, at 11:2-15.) In effect, Plaintiff is arguing that the Court should ignore her causation experts' reports—both of which recognized that further evaluation was only necessary once Plaintiff exhibited objective symptoms related to potential heart failure—and find that a fact question exists on causation because ACH should have tested her despite the fact that she never exhibited symptoms associated with heart failure during the ACH time period. Plaintiff's argument that further testing might have revealed a heart issue is far too speculative to establish a fact question on causation. If the Court accepts Plaintiff's causation experts' opinions as true, Plaintiff would be allowed to recover for actions by ACH staff that caused no harm, a result that is inconsistent with both federal and Arizona law.

Even ignoring the above pitfalls for her, Plaintiff's own separate factual assertions eviscerate her causation theory against ACH. For example, Plaintiff maintains "Amanda's cardiac arrest on November 8, 2022 at about 11:24 a.m., occurred after months without any cardiac assessment, escalating textbook manifestations of heart failure (progressive bilateral edema, dyspnea, rapid weight gain), and exposure to a dangerously high risk polypharmacy regiment (amitriptyline, Mirtazapine, gabapentin, quetiapine, buspirone)." (PASOF ¶ 21.) As explained above, Plaintiff neither exhibited these objective symptoms nor was prescribed many of the alleged causative medications during the ACH timeframe.

Plaintiff further maintains: "**<u>Wexford's cardiotoxic medication regiment created the underlying vulnerability</u>**, and **<u>these untreated infections</u>** [(pneumonia and a urinary tract infection that arose during the Wexford time period)] **<u>were the 'final hit,' precipitating full decompensation and cardiac arrest</u>**." (PASOF ¶ 22 (emphasis added).) Therefore, accepting ACH or Plaintiff's factual assertions as true leads to the same conclusion: Plaintiff cannot establish ACH caused her injuries, as a matter of law.

## III. PLAINTIFF ALSO CANNOT ESTABLISH *OBJECTIVE INDIFFERENCE* THAT PUT HER AT A SUBSTANTIAL RISK OF SUFFERING SERIOUIS HARM

Under the third *Gordon* factor, Plaintiff must establish that:

> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious[.]

*Gordon*, 888 F.3d at 1125. The crux of Plaintiff's argument is (or certainly becomes in light of her failure to establish substantial risk of significant harm and causation) that ACH allegedly failed to "tak[e] reasonable measures to abate the risk" associated with being prescribed amitriptyline, thus causing Plaintiff's injuries, a brain injury allegedly caused by heart complications that manifested over half a year after ACH ceased operations as the medical provider at Navajo County Jail.[3] (Doc. 212, at 7:13-18.) Contrary to Plaintiffs' arguments, she cannot establish objective indifference under *Gordon* or *Russel*.

*Gordon* and *Russel* are inapposite to this case. In *Gordon*, an inmate exhibited objective symptoms of severe opiate withdrawal, vomiting and physical distress, over approximately a 28-hour period, and medical staff failed to adequately monitor his condition, resulting in the inmate's death. 888 F.3d at 1121-22. The Ninth Circuit

[3] At trial, ACH will join with co-defendants in the anticipated position that there is evidence that Plaintiff's alleged congestive heart failure was not the cause of her injuries, but, rather, that Plaintiff's injuries were caused by fentanyl use. Nonetheless, even if the Court ignores the evidence associated with Plaintiff's fentanyl use, summary judgment in favor of ACH is still warranted in light of the arguments herein and in ACH's summary judgment motion.

concluded: "Because the district court applied a subjective standard to the plaintiff's claim of inadequate medical care, the grant of summary judgment was in error." *Id.* at 1125. In *Russel v. Lumitap*, an inmate exhibited objective health complications, breathing issues, vomiting, unresponsiveness, high blood pressure, and chest/throat pain, over approximately a 14-hour period, and ultimately died from aortic dissection. 31 F.4th 729, 733-35 (9th Cir. 2022). The Ninth Circuit denied various providers' summary judgment motion in part because the providers were objectively indifferent to Plaintiff's objective symptoms and failed to adequately respond. *Id.* at 740-45.

Unlike the inmates in *Gordon* and *Russel*, who exhibited objective health issues over a brief period, Plaintiff never exhibited objective symptoms of heart failure that mandated further evaluation by ACH providers during the entire ACH timeframe. Significantly, Plaintiff's own cardiology expert, Dr. Brodsky, identified certain objective symptoms that would necessitate further diagnostic testing. (SOF ¶ 20.) These objective symptoms include edema, dyspnea, weight gain, and high dose polypharmacy. (*Id.*) Plaintiff concedes that she never exhibited any of these objective symptoms and was not prescribed many of the medications Dr. Brodsky mentions as exposing Plaintiff to high dose polypharmacy. (PRSOF ¶¶ 21-23, 25.)

Plaintiff's admissions are fatal to Plaintiff's claim against ACH. Without objective symptoms, no reasonable juror could conclude that ACH providers were objectively indifferent to Plaintiff's serious medical needs. Moreover, when Plaintiff did exhibit objective symptoms that required further evaluation and treatment, general complaints of not feeling well and eyesight issues, ACH personnel provided the necessary medical care to Plaintiff by conducting encounters, evaluating Plaintiff, and providing appropriate treatment. (*See generally* SOF ¶¶ 10-17.) As recognized by the Ninth Circuit, "the Supreme Court has instructed that 'mere lack of due care by a state official' does not 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment.'"

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31, 106 S. Ct. 662, 662 (1986)). In stark contrast to the Supreme Court's instruction, Plaintiff's claim is based entirely on a failure to abate a speculative risk for which no objective symptoms existed that would mandate further evaluation or treatment. Plaintiff cannot meet her burden of establishing that the medical care provided by ACH personnel fell below the objective reasonableness standard espoused in *Gordon* and *Russel*. In reality, Plaintiff's belief that further testing was necessary is at most a difference of medical opinion, which is insufficient to establish deliberate indifference as a matter of law. *See Toguchi, 391 F.3d at 1058*.

As a final point, to the extent Plaintiff relies on her experts' opinions regarding the potential cardiotoxic side effects associated with her medications, such arguments do not establish deliberate indifference. (Doc. 212, at 8.) As recognized by federal courts in other jurisdictions, "prescribing medications with potential side effects does not necessarily amount to deliberate indifference to serious medical needs." *Gardner v. Malik*, 3:24-CV-1843, 2024 WL 4592350 (M.D. Pa. Oct. 28, 2024); *Maldonado v. Terhune*, 28 F. Supp. 2d 284, 290 (D.N.J. 1998) (accord).

## IV. PLAINTIFF'S *MONELL* CLAIM FAILS DUE TO THE LACK OF A POLICY, CUSTOM, OR PRACTICE THAT WAS THE MOVING FORCE BEHIND THE ALLEGED CONSTITUTIONAL VIOLATION

Plaintiff's Response does not identify a single ACH policy that was the moving force behind the alleged constitutional violation. Instead, Plaintiff relies on Dr. McMunn's expert opinions to establish that ACH had various unconstitutional practices in place. (Doc. 212, at 8-9.) Significantly, Plaintiff drastically misrepresents the content of Dr. McMunn's report. (*Compare* Doc. 212, at 9:1-11, *with* Doc. 198, at 120:8-15.) McMunn only rendered three opinions regarding ACH's alleged improper practices:

- Continued and then increasing the dosage of amitriptyline to 300 mg without any supporting documentation to justify the dosage or safety precautions to reduce the risk to the patient's safety.

- Failed to provide blood pressure medication for over a week.
- Did not order EKG, laboratory work, order prior treatment records, or refer to a specialist.

(Doc. 198, at 120:8-15.)[4]

Plaintiff reliance on Dr. McMunn's report does not adequately address the deficiencies with her *Monell* claim against ACH, namely, that one or two isolated instances are insufficient to establish the existence of a widespread custom or practice. (Doc. 197, at 10:2-12:8.) Even if the Court accepts all of McMunn's opinions as true, there is no basis to conclude that an unconstitutional custom or practice existed.

Evidence that ACH medical staff once continued and once increased Plaintiff's amitriptyline only provides two (2) data points. (SOF ¶¶ 6, 9.) Consequently, Plaintiff cannot establish that ACH had a custom or practice of improperly continuing or increasing medication in general. Moreover, Plaintiff does not appear to take issue with being prescribed amitriptyline, but rather the purported lack of monitoring associated with taking this medication. Likewise, the failure to provide blood pressure medication on one (1) occasion and a general allegation that ACH did not order an EKG, labs, prior treatment records, or refer Plaintiff to a specialist are equally insufficient to demonstrate the existence of a custom or practice under *Monell*. If the Court permitted the alleged insufficient testing claim to proceed to trial, then virtually every inmate prescribed with

---

[4] Dr. McMunn's rebuttal opinion contains additional opinions regarding ACH's alleged standard violations based on Wexford's Corrective Action Plan, which is a document generated after ACH ceased operations at Navajo County Jail. (Doc. 204-1, at 55-56.) "Rule 56 motions are designed to test the sufficiency of the non-moving party's case-in-chief, and weed out cases which cannot be successfully presented at trial." *Ellis v. Corizon, Inc.*, No. 1:15-CV-00304-BLW, 2018 WL 6268199, at *4 (D. Idaho Nov. 30, 2018). Dr. McMunn's rebuttal report cannot be used in Plaintiff's case-in-chief, and thus, any additional opinions contained therein should be disregarded for purposes of ACH's Motion for Summary Judgment. *See Ocampo v. Corizon, LLC.*, 1:18-CV-00047-DCN, 2020 WL 6219790, at *9 (D. Idaho Oct. 21, 2020), *aff'd sub nom. Ocampo, v. Corizon LLC.*, 20-35990, 2022 WL 229093 (9th Cir. Jan. 25, 2022); *see also In re Conservatorship for Hardt*, 242 Ariz. 449, 452, ¶ 13, 397 P.3d 1049, 1052 (App. 2017) ("Rebuttal evidence is to counter a new fact or allegation made by an opponent's case.").

medications that *could* have an adverse health effect could maintain a claim for deliberate indifference despite the absence of objective symptoms necessitating further evaluation.

Seemingly concerned with these deficiencies, Plaintiff relies upon Wexford's Corrective Action Plan ("CAP"), which according to Plaintiff, "identifies concrete practices and systemic failures attributable to ACH that a jury could find unconstitutional under the objective deliberate indifference standard." (Doc. 212, at 8:19-21.) Wexford's Corrective Action Plan does not establish the existence of an unconstitutional custom or practice. The CAP is inadmissible hearsay as to ACH. *See* Fed. R. Evid. 801, 802. And even if an exception to the rule against hearsay applied, the CAP is a subsequent remedial measure by the jail (through its subsequent healthcare provider agent, Wexford), which is inadmissible under Rule 407. *See* Fed.R.Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; [or] culpable conduct…."); *see also* *Fisher v. Bumbo Int'l Tr.*, 1:14-CV-22209-UU, 2014 WL 12042519, at *4 (S.D. Fla. Aug. 27, 2014) ("A report prepared for the purpose of improving procedures to prevent future harms is a subsequent remedial measure."))

Plaintiff proceeds to argue that ACH attempts to re-characterize the alleged deficient practices as "isolated errors by individual nurses or providers." (Doc. 212, at 10.) This argument misconstrues ACH's argument. ACH's Motion applies the legal standard for proving a custom or practice, i.e., which requires the demonstration of more than one (1) or two (2) incidents, to the undisputed facts of this case. *See Oyenik v. Corizon Health Inc.*, 696 Fed. Appx. 792, 794 (9th Cir. 2017). Whereas Plaintiff's argument reflects a mere disagreement with the legal standard to establish *Monell* liability. Contrary to the applicable legal standard, Plaintiff attempts to lump multiple unrelated actions together to survive summary judgment. (Doc. 212, at 2-6.) Plaintiff's places all these isolated practices in the bucket of "this was 'how ACH did business." (*Id.*) Plaintiff's attempt to place every

alleged unconstitutional practice under one umbrella perverts the legal standard for establishing *Monell* liability, namely, that there is a link between the constitutional deprivation and the custom or practice. Dr. McMunn, Plaintiff's own expert, identifies three (3) separate alleged improper practices related to ACH: failure to provide blood pressure medication for a week; and then continuing, then increasing, a prescription, on two (2) total occasions, respectively; these are textbook isolated incidents to which *Monell* liability cannot extend.

The only alleged improper practice highlighted by Dr. McMunn that arguably extended over a period of time is not conducting further testing. As argued above and below, Plaintiff cannot establish deliberate indifference or the necessary causal link related to this issue. The relevant medical records further demonstrate that Plaintiff received monitoring during the ACH timeframe, just not the monitoring that she now claims was necessary. (*See generally* SOF ¶¶ 10-17.) As argued above, Plaintiff's causation experts' opinions, if accepted as true, and the undisputed facts conceded by Plaintiff, demonstrate that Plaintiff exhibited no objective symptoms that necessitated further testing.

## V. PLANTIFF'S MEDICAL NEGLIGENCE CLAIMS FAIL DUE TO INADEQUATE EXPERT OPINION; PLAINTIFF IS STILL REQUIRED TO ESTABLISH CAUSATION VIA EXPERT TESTIMONY

Plaintiff's attempt to re-characterize her medical malpractice claim as an institutional liability claim misses the point of ACH's argument. (Doc. 212, at 11-12.) To the extent that Plaintiff asserts a vicarious liability claim premised on Dr. Martin's decision to increase her amitriptyline prescription to 300mg, Dr. McMunn, a DNP, is not qualified to opine on the standard of care that applies to Dr. Martin, a M.D. (Doc. 197, at 17:7-15.) ACH does not dispute that under *Windhurst v. Arizona Department of Corrections*, A.R.S. § 12-2604 does not apply to institutional negligence claims. But *Windhurst* does not eliminate Plaintiff's burden of establishing causation. 256 Ariz. 186, 194, 536 P.3d 764, 772 (2023) ("Causation is a legal requirement for any medical malpractice claim.")

Moreover, "[i]n most medical malpractice cases, a plaintiff must establish causation using expert testimony." *Id.* Here, Plaintiff maintains that she suffered from medication-induced heart failure. This claim is precisely that type of claim that requires expert testimony to support causation. Plaintiff's characterization of her claim as an institutional negligence claim is a distinction without a difference. Accepting Plaintiff's expert opinions as true, Plaintiff fails to establish causation. *See* Section II, *supra*.

## VI. PLAINTIFF'S NEGLIGENCE CLAIM/GROSS NEGLIGENCE CLAIM RELIES ON EXPERT TESTIMONY THAT ACTUALLY SUPPORTS SUMMARY JUDGMENT IN ACH'S FAVOR

Plaintiff's arguments related to her negligence/gross negligence claim are virtually identical to the medical malpractice claim. (Doc. 212, at 12-13.) Plaintiff maintains that causation is satisfied because "[t]he experts explain that basic supervision, mental-health evaluation, recordkeeping, or cardiac monitoring during the ACH period likely would have interrupted the dangerous trajectory that led to her collapse" over half-a-year later. (Doc. 212, at 13.) Again, Plaintiff vastly misrepresents her experts' opinions. Even assuming Plaintiff could establish a breach of the standard of care, Plaintiff cannot establish causation. The purported "missed opportunities" identified by Dr. Brodsky are not attributable to ACH. Moreover, accepting Plaintiff's expert opinions as true would mean that cardiac testing was necessary once Plaintiff began to exhibit objective symptoms associated with heart failure, none of which Plaintiff exhibited during the ACH timeframe. Plaintiff's must prove ACH caused her injuries. Merely pointing out things that ACH should have done differently is insufficient for Plaintiff to meet this burden. She must introduce competent evidence that causally links these alleged failures to her alleged heart condition and the November 8, 2022, incident. Plaintiff attempts to satisfy her burden of proof with expert opinions; however, these opinions are insufficient as a matter of law to establish that ACH caused Plaintiff's injuries.

## VII. PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES

Plaintiff fails to establish a claim for punitive damages. First, Plaintiff argues punitive damages are warranted because "ACH increased cardiotoxic psychotropics without conducting any meaningful mental-health examination." (Doc. 212, 14.) As argued above, this argument is based on ACH being held vicariously liable for Dr. Erik Martin's decision to increase Plaintiff's amitriptyline prescription. Plaintiff's standard of care expert, Dr. McMunn, a DNP, is not qualified to opine how an MD's conduct fell below the standard of care.

Next, Plaintiff rattles of the same laundry list of medical care that was not provided to her and generally asserts that ACH's conduct was reckless. (*Id.*) For the reasons argued above, this argument is insufficient to establish punitive damages. Plaintiff never exhibited objective symptoms that necessitated further testing and when Plaintiff did exhibit objective symptoms, she received care from providers.

## VIII. CONCLUSION

For the foregoing reasons, ACH requests that the Court grant its Motion for Summary Judgment, dismiss Plaintiff's claims against it with prejudice, and award ACH its costs and fees.

RESPECTFULLY SUBMITTED this 20th day of January, 2026.

BROENING OBERG WOODS & WILSON, P.C.

By *<u>/s/Jeremiah M. Sullivan</u>*

Sarah L. Barnes
Jeremiah M. Sullivan
2800 N. Central Avenue, Suite 1600
Phoenix, AZ 85004
*Attorneys for Defendants Advanced Correctional Healthcare, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF system for filing and the attached document to the Clerk's Office using the CM/ECF System for filing, with copies submitted electronically to the following recipients:

David J. Don
Law Offices of David J. Don, PLLC
301 E. Bethany Home Rd.
Suite B-100
Phoenix, AZ 85012
*Counsel for Plaintiff*

John A. Klecan
Brandi C. Blair
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue
Suite 2700
Phoenix, AZ 85004
*Counsel for Defendant Wexford Health Sources, Inc., Olayinka Osinloye and Jamal Jones*

JT Shoaf
Gust Rosenfeld, P.L.C.
One East Washington Street
Suite 1600
Phoenix, AZ 85004-2553
*Counsel for Defendant Ellen Morse, NP*

Daniel J. O'Connor, III
Jenn I. Tetreault
O'Connor Law P.C.
7955 S. Priest Dr.
Tempe, AZ 85284
*Counsel for Defendants County of Navajo, David M. Clouse, Navajo County Jail District*

/s/ *Suzanne Beard*

# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AMANDA GARDNER,<br><br>Plaintiff,<br><br>vs.<br><br>NAVAJO COUNTY, et al.,<br><br>Defendants. | No. CV-23-08594-PCT-SRB |

**THE DEPOSITION OF ELLEN MORSE**

**(Video Conference - Video recorded)**

Phoenix, Arizona
December 9, 2024
9:08 a.m.

(ORIGINAL)

**PREPARED FOR:**

DISTRICT COURT

**REPORTED BY:**
Herder & Associates
Marty Herder, CCR, CSR
Certified Court Reporter
AZ-CR No. 50162

Q. Okay. Do you have any --
A. I'm sorry.
Q. I'm sorry.
Do you have an independent recollection of meeting Amanda Gardner in person?
A. Yes.
Q. Now, you contracted directly with Navajo County until December, '21, and did you ever contract with an entity called ACH, Advanced Correctional Health?
A. No.
Q. Did you ever have a contract with Wexford Health Sources?
A. Yes, I did.
Q. And when did you have a contract with Wexford?
A. From April 14th, 2022, to July 15th, 2023.
Q. Did you have a written contract with Wexford?
A. Yes, I did.
Q. And how many pages is that contract?
A. Let's see.
A total of four pages, I believe.
Q. What's the date of that contract?
A. I don't have it in front of me. I don't have the original one.
Q. Okay. You have a copy?
A. Not available at this time. It's packed away in

A. October and November and one week into December.

Q. And then from December until I guess March or April of '22 you did not work at the jail; is that correct?

A. Correct. I worked at the jail starting April 14th.

Q. And at that point Wexford had the contract?

A. Correct.

Q. So from October to December of '21 did you have a contract with Advanced Correctional Health Care?

A. No.

Q. Did you have any coordination of treatment with Advanced Correctional Health Care during that period you worked there?

A. I believe that the only coordination that happened was through the nursing supervisor who left the first week of December. But I never spoke to Advanced Correctional Health.

Q. Who was the nursing supervisor?

A. Russell Kruse.

Q. Now, before October, '21, who, if anyone, contracted with the County for medical care in the jail?

A. I'm sorry, before who? What?

Q. Before Advanced Correctional Health Care got the contract for Navajo County, who contracted with Navajo County, if anyone?

# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

AMANDA GARDNER, )
)
Plaintiff, )
)
vs. ) No. CV-23-08594-PCT-SRB
)
NAVAJO COUNTY, et al., )
)
Defendants. )
)

**THE DEPOSITION OF OLAYINKA OSINLOYE, NP**

**(Video Conference-Video Recorded)**

Phoenix, Arizona
October 10, 2024
9:03 a.m.

(ORIGINAL)

**PREPARED FOR:**

SUPERIOR COURT

**REPORTED BY:**
Herder & Associates
Marty Herder, CCR, CSR
Certified Court Reporter
AZ-CR No. 50162

They -- a bunch -- they send me a bunch of documents that I was talking about, so I was reviewing everything that other people charted, and that was like a few months ago.

Q. So you reviewed Amanda Gardner's medical chart?

A. Yes. I do. When I see her, I do review the chart.

Q. Okay. And did you review any other documents? Did you review a deposition transcript?

A. I'm not sure what that is. I reviewed what is sent to me. I am not sure what that means.

MR. KLECAN: David, I didn't send her Jessica's deposition.

MR. DON: Okay.

BY MR. DON:

Q. Have you ever been employed by Navajo County?

A. No, just that 2022 that I was there and just for one month.

Q. Were you ever employed by Advanced Correctional Health?

A. Advanced? No. I'm not aware of them.

Q. Tell us how you came to be employed by Wexford.

A. Well, I was -- I applied for a psych practitioner. They offered me a part-time, which is I worked there once a week. And that is how I come to work for them.